UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

KENNETH DAYWITT,

                              Plaintiff,

v.

JODI HARPSTEAD ET AL.,

                              Defendants.

Civil No. 24-214 (JRT/SGE)

**MEMORANDUM OPINION AND ORDER ADOPTING THE REPORT AND RECOMMENDATION AS MODIFIED**

---

Kenneth Daywitt, 100 Freeman Drive, Saint Peter, MN 56082, *pro se* Plaintiff.

Brandon L. Boese and Drew Bredeson, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Sute 1100, Saint Paul, MN 55101, for Defendants.

Plaintiff Kenneth Daywitt has been civilly committed to the Minnesota Sex Offender Program since 2009. He was originally located at the Moose Lake facility, where he worked to establish a religious group dedicated to Jewish services and studies. Daywitt has since been transferred to the St. Peter facility, which does not have an established Jewish religious group. Daywitt now claims that he cannot fully express his religious beliefs at the St. Peter facility. Magistrate Judge Tony N. Leung[1] issued a report and recommendation ("R&R") recommending that the Court dismiss Daywitt's complaint.

---

[1] The action has since been reassigned to Magistrate Judge Shannon G. Elkins.

Because Daywitt failed to allege sufficient claims, the Court will overrule his objections, adopt the R&R, and grant Defendants' motion to dismiss.

## BACKGROUND

### I.   FACTS

Plaintiff Kenneth Daywitt is civilly committed to the Minnesota Sex Offender Program ("MSOP"), which is operated by the Minnesota Department of Human Services ("DHS"). (Compl. at 4, Jan. 25, 2024, Docket No. 1.)  Daywitt previously was placed at the Moose Lake MSOP facility but was transferred to the St. Peter MSOP facility in January 2022.  (*Id.* ¶ 1.)

Daywitt adheres to Orthodox Judaism. (*Id.* ¶¶ 1,18.)  While at Moose Lake, Daywitt was able to participate in the Jewish group which had many specific foods for Jewish holidays, rabbis that would visit the facility, streaming services, and other specific religious accommodations.  (*Id.* ¶¶ 24, 27–29.)

Daywitt alleges that since his transfer to the St. Peter facility, he has been unable to enjoy the same religious accommodations.  (*Id.* ¶ 27.)  St. Peter does not have an established Jewish group because MSOP policy requires at least six people to express an interest in forming a spiritual group.  (*Id.* ¶ 35.)  Daywitt alleges that the lack of an established group has made him ineligible to receive the same benefits.  (*Id.* ¶¶ 30–31, 37, 44, 53, 56, 59, 63.)

Specifically, in 2022, Daywitt alleges that he was provided food that was inadequate during Passover and was denied the ability to outsource the correct food, so

he did not eat for eight days. (*Id.* ¶¶ 45–46.) In 2023, Daywitt was able to purchase food that was kosher for Passover but only after alleged refusals by Defendants. (*Id.* ¶¶ 47–50.) Daywitt also alleges that he was denied the right to purchase specific foods for Jewish holidays (apples and honey for Rosh Hashanah, sufganiyyot for Hanukkah, and cheesecake for Shav'uot), as those were only for established religious groups. (*Id.* ¶¶ 52–60.)

Daywitt further alleges that his access to religious services has been limited. Daywitt alleges that the St. Peter facility denied him individual streaming services after a rabbi indicated it would be too far to travel and that the St. Peter facility would not allow Daywitt to receive religious study materials that were printed off the internet. (*Id.* ¶¶ 36–40.) Although the St. Peter facility ultimately allowed Daywitt to stream the Hoshana Rabba service, Daywitt alleges it was only after considerable dispute. (*Id.* ¶ 43.) Daywitt also contends that when the St. Peter facility had technical issues with streaming services, it refused to expand to alternate synagogues, as the Moose Lake facility would. (*Id.* ¶ 44.)

Daywitt acknowledges that in some instances, the St. Peter facility provided alternatives. For example, in 2023, Daywitt was able to purchase his own meals for Passover and Daywitt was informed that although he could not possess materials printed from the internet, he could purchase those items. (*Id.* ¶¶ 39, 50.)

Daywitt also acknowledges that the St. Peter facility largely followed the MSOP's policies and the terms of prior settlements. (*Id.* ¶¶ 28, 34–35, 43–44, 52–60.) MSOP's

Spiritual Practices Policy states that those wishing to form a spiritual group may do so "[w]hen six clients have each submitted a Client Request . . . expressing interest in a potential spiritual group . . . ." (Decl. of David Bornus ("Bornus Decl.") ¶ 3, Ex. A ("Spiritual Practices Policy") at 3,[2] Apr. 15, 2024, Docket No. 20.)[3] MSOP's Spiritual Practices Policy also notes that "[p]otential groups of fewer than six clients may be considered." (*Id.*) MSOP only permitted food during spiritual ceremonies or studies when pre-approved. (*Id.* at 4.) MSOP's Client Property Policy requires that "[a]ll incoming client property must be new and from a vendor . . . ." (Bornus Decl. ¶ 4, Ex. B at 15.) Finally, Daywitt previously settled two actions against MSOP allowing him to stream one Shabbat service monthly and all Holy Day services and to miss a certain number of treatment days each quarter for Jewish Holy Days. (Compl. ¶¶ 21, 23.)

Because of the conditions at the St. Peter facility, Daywitt alleges that he cannot maintain the interactive component of his faith he had at the Moose Lake facility. (*Id.* ¶ 41.) And because, he alleges, his faith is "an intricate piece of his character and is imperative to his mental prosperity and wellbeing[,]" his treatment has suffered. (*Id.* ¶¶ 41–42.)

---

[2] Any page numbers reference ECF pagination.
[3] The Court may consider the MSOP Spiritual Practices Policy and MSOP Client Property Policy because they are embraced by the Complaint. (Compl. ¶¶ 35, 39); *Enervations, Inc. v. Minn. Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004).

## II. PROCEDURAL HISTORY

Daywitt brings a four-count complaint against MSOP, DHS, and various officials from those agencies in their individual and official capacities. (Compl. ¶¶ 2–11, 66–101.) Daywitt's complaint alleges that Defendants (1) denied his freedom of expression in violation of the First and Fourteenth Amendments of the United States Constitution, Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Minnesota State Constitution, (2) denied his right to equal protection in violation of the First and Fourteenth Amendments, RLUIPA, and the Minnesota State Constitution, (3) subjected to him to inhumane treatment in violation of the First and Fourteenth Amendments and the Minnesota State Constitution, and (4) denied his right to free exercise of religion in violation of the First Amendment and Equal Protection Clause of the Fourteenth Amendment. (*Id.* ¶¶ 66–101.)

Defendants filed a motion to dismiss. (Mot. Dismiss, Apr. 15, 2024, Docket No. 17.) The Magistrate Judge issued an R&R recommending that the Court dismiss Daywitt's complaint in its entirety: dismissing Daywitt's RLUIPA, First Amendment, Minnesota Constitution free exercise, and equal protections claims without prejudice and dismissing Daywitt's substantive due process, individual capacity, and official-capacity damages claims with prejudice. (R. & R. at 20–21, Dec. 17, 2024, Docket No. 32.) Daywitt timely objected. (Obj. to R. & R., Jan. 2, 2025, Docket No. 33.)

**DISCUSSION**

**I.   STANDARD OF REVIEW**

After a magistrate judge files an R&R, a party may "serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *accord* D. Minn. LR 72.2(b). "The objections should specify the portions of the magistrate judge's report and recommendation to which objections are made and provide a basis for those objections." *Mayer v. Walvatne*, No. 07-1958, 2008 WL 4527774, at *2 (D. Minn. Sept. 28, 2008). For dispositive motions, the Court reviews de novo a "properly objected to" portion of an R&R. Fed. R. Civ. P. 72(b)(3); *accord* D. Minn. LR 72.2(b)(3). Sometimes courts review general and conclusory objections for clear error. *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). The Eighth Circuit instructs that clear error is appropriate when general and conclusory objections "make it difficult for the district court to focus upon the alleged errors if insufficiently directed by the parties." *Id.*

Because Daywitt brings specific objections, the Court will conduct de novo review.

**II.   ANALYSIS**

Daywitt brings four counts with overlapping allegations. In the interest of clarity, the Court will analyze the various allegations by their subject matter or relief sought. The categories the Court will evaluate are (1) free exercise claims, (2) claims brought under the Fourteenth Amendment, (3) individual capacity claims, and (4) official capacity damages claims.

As a threshold matter, Defendants argued in their motion to dismiss that Daywitt's claims were barred by claim preclusion, citing *Karsjens v. Harpstead*, No. 11-3659. The *Karsjens* litigation has provided a claim preclusive effect in many subsequent MSOP related cases. *See, e.g.*, *Larson v. Minn. Sex Offender Program*, No. 13-1074, 2024 WL 448305, at *4 (D. Minn. Feb. 6, 2024), *aff'd*, No. 24-1318, 2024 WL 4432622 (8th Cir. Oct. 7, 2024). But the claims Daywitt brings are those that the *Karsjens* court intended to leave open, specifically individual allegations of constitutional violations. *Karsjens v. Piper*, 336 F. Supp. 3d 974, 997 (D. Minn. 2018). So, the Court will adopt the R&R's conclusion that Daywitt's claims are not barred by claim preclusion.

### A. Free Exercise Claims

Daywitt alleges that his treatment at the St. Peter facility denied him the freedom to exercise his religion as guaranteed by the RLUIPA, the First Amendment of the United States Constitution, and the free exercise clause of the Minnesota State Constitution. Because the RLUIPA and the First Amendment share a thresholding showing, those claims will be evaluated together.

#### 1. RLUIPA and First Amendment

Daywitt alleges that the MSOP Spiritual Practices Policy violates the mandates of the RLUIPA and his free exercise rights under the First Amendment.

To plead an RLUIPA[4] or First Amendment free exercise claim, a plaintiff must first plead that the policy "placed a 'substantial burden' on his ability to practice his religion." *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008) (quoting *Weir v. Nix*, 114 F.3d 817, 820 (1997)). Substantial burden has been defined as governmental action that must

> significantly inhibit or constrain conduct or expression that manifests some central tenant of a person's individual religious beliefs; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion.

*Weir*, 114 F.3d at 820 (cleaned up). If a plaintiff can show that a substantial burden has been placed on their ability to practice their religion, courts apply a modified multifactor test originating in *Turner v. Safely*, 482 U.S. 78, 89–91 (1987) to determine if that substantial burden is "reasonably related to legitimate therapeutic or institutional interests." *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 937 (8th Cir. 2014) (discussing the application of *Turner* in the context of civil commitment).

---

[4] Ordinarily, the RLUIPA requires specific pleadings about federal funding; however, the Eighth Circuit has recently clarified that the pleading standards for pro se litigants should not be enforced so strictly. *Barnett v. Short*, 129 F.4th 534, 539 (8th Cir. 2025) ("A decision to the contrary would effectively cut off many potentially meritorious RLUIPA claims despite the liberal construction owed to pro se complaints and Congress's instruction that RLUIPA 'shall be construed in favor of a broad protection of religious exercise.'" (quoting 42 U.S.C. § 2000cc–3(g))).

Though parties dispute the scope of the substantial burden analysis, Daywitt is clear that he believes that it is the MSOP Spiritual Practices Policy itself that violates his free exercise rights. But that policy does not impose a substantial burden on Daywitt's ability to exercise his religion. It is true that the Spiritual Practices Policy provides opportunities to those who are part of a formal group. It is also true that such groups normally require six or more persons to request such services. However, the Spiritual Practices Policy also specifically identifies an opportunity to apply for religious group status with fewer than six people. Daywitt has not alleged that he attempted to apply for such a group, nor that his request was denied. Instead, Daywitt alleges that the St. Peter facility specifically told him to follow the group policy if he wanted to start a group at that facility. Absent more detailed pleading, the Court is unable to evaluate whether MSOP's Spiritual Practices Policy substantially burdens Daywitt's ability to practice his religion.

Still, one allegation does give the Court some pause: Daywitt's inability to purchase meals that comport with Passover requirements. In his complaint, Daywitt alleges that in 2022, he went without food for eight days because he did not receive Passover meals. In 2023, however, the St. Peter facility remedied this deficiency by allowing Daywitt to purchase his own Passover meals. Then, in his briefing only, Daywitt alleges that in 2024 he was provided with non-Passover meals. The Court understands that Daywitt omitted that information from his complaint as it was filed prior to Passover in 2024, but the Court is obliged to evaluate the plausibility of the claims from the complaint alone. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (discussing facial plausibility). So, as pled, Daywitt has not alleged a substantial burden on his ability to obtain Passover meals as the St. Peter facility allowed him to purchase other meals. *Patel*, 515 F.3d at 813 ("Courts generally have found that no 'substantial burden' exists if the regulation merely makes the practice of a religious belief more expensive."). If this problem persists, the Court suggests that Daywitt include such allegations in an amended complaint.

In sum, because Daywitt has failed to plead a substantial burden on his ability to practice his religion, his claims under the RLUIPA and the First Amendment fail. The Court will overrule Daywitt's objection and adopt the R&R's recommendation to dismiss his RLUIPA and First Amendment claims without prejudice.

### 2. Minnesota Constitution

Daywitt additionally brings a claim under the free exercise clause of the Minnesota State Constitution.

The Court must first address whether it can evaluate a claim brought under the free exercise clause of the Minnesota Constitution. Generally, there is no private right of action to enforce the Minnesota Constitution.[5] *Guite v. Wright*, 976 F. Supp. 866, 871 (D. Minn. 1997), *aff'd on other grounds*, 147 F.3d 747 (8th Cir. 1998); *see also Mlnarik v. City of Minnetrista*, No. A09-910, 2010 WL 346402, at *1 (Minn. Ct. App. Feb. 2, 2010) ("[N]o

---

[5] To the extent that Daywitt brings a claim under Article 1, Section 5 of the Minnesota Constitution, the Court must dismiss that claim because there is no caselaw suggesting a private right of action.

-10-

private cause of action for a violation of the Minnesota constitution has yet been recognized."). But Minnesota courts have recognized a private right of action under the free exercise clause of the Minnesota Constitution. *Hill-Murray Fed'n of Tchrs. v. Hill-Murray High Sch.*, 487 N.W.2d 857, 865 (Minn. 1992); *see also Moser*, 2019 WL 5104804, at *5 (D. Minn. June 5, 2019) (collecting cases). Still, the recognition of a private right of action does not itself waive Eleventh Amendment sovereign immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 n.9 (1984).

The Court does not see a clear manifestation by Minnesota to waive its sovereign immunity and consent to suits under the free exercise clause of the Minnesota State Constitution in federal court. So, the Court is likely without jurisdiction to consider Daywitt's free exercise claim under the Minnesota Constitution.

But even if Minnesota had consented to suit, Daywitt's free exercise claim under the Minnesota Constitution fails on the merits. Minnesota courts find a violation of the free exercise clause of the Minnesota Constitution when four factors are met: "whether the objector's belief is sincerely held; whether the state regulation burdens the exercise of religious beliefs; whether the state interest in the regulation is overriding or compelling; and whether the state regulation uses the least restrictive means." *Hill-Murray*, 487 N.W.2d at 865. Under the second factor, the plaintiff must show that the regulation "infringe[s] on their religious autonomy or require[s] conduct inconsistent with their beliefs." *Edina Cmty. Lutheran Church v. State*, 745 N.W.2d 194, 204 (Minn. Ct. App.

2008) (discussing the test described in *Hill-Murray*). Further, that risk of interference must be real and not "remote." *Id.* (citing *Hill-Murray*, 487 N.W.2d at 866).

Daywitt alleges that the MSOP Spiritual Practices Policy burdens his ability to practice his religion. Specifically, Daywitt argues that the MSOP Spiritual Practices Policy precludes him from performing religious conduct because there is not a Jewish group at the St. Peter facility. But this argument fails for the same reason as his other free exercise claims. The Court is unable to assess whether the policy actually prohibits any activity because the complaint does not articulate whether Daywitt applied for group status (as the St. Peter facility advised him to do) or whether the St. Peter facility denied that request. The harm alleged is vague and speculative, so the Court cannot evaluate any burdensome nature of the MSOP Spiritual Practices Policy under the Minnesota State Constitution. The Court will overrule Daywitt's objection and adopt the R&R's recommendation to dismiss Daywitt's Minnesota State Constitution free exercise claim without prejudice.

### B. Fourteenth Amendment Claims

Daywitt appears to bring both a substantive due process and equal protection claim under the Fourteenth Amendment. Though Daywitt does not explicitly object to the Magistrate Judge's conclusion on his substantive due process claim, the Court will nevertheless review that conclusion de novo.

### 1. Substantive Due Process

Because Daywitt's allegations of religious interference fall squarely within the protections covered by the First Amendment, Daywitt may not use substantive due process as the basis of his claim. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing those claims." (quotation omitted)). The First Amendment is the proper vehicle to bring his free exercise claims so the Court will adopt the R&R's recommendation to dismiss any substantive due process claims with prejudice.

### 2. Equal Protection

Daywitt alleges that the St. Peter facility violated his equal protection rights because it treated him differently than the people belonging to a Jewish group at the Moose Lake facility.

To adequately plead an equal protection claim, a plaintiff must first show that they were treated differently than similarly situated people based on a protected status. *Borgren v. Minnesota*, 236 F.3d 399, 408 (8th Cir. 2000). If a plaintiff fails to meet that threshold showing, their equal protection claim must be dismissed. *Klinger v. Dep't of Corrs.*, 31 F.3d 727, 731 (8th Cir. 1994).

Daywitt has failed to allege that he was treated differently from similarly situated people because of his religion. True, he alleges that he was treated differently than

members of the official Jewish group established at Moose Lake. But that comparison is insufficient because Daywitt is not similarly situated to those people. They have official group status as a Jewish group, and Daywitt does not. In briefing, Daywitt also asserts he is similarly situated with people in other faith groups and yet does not get the same benefits and attention. But Daywitt is not similarly situated with other faith groups because those groups have successfully requested recognition from MSOP. As alleged, Daywitt has not. Indeed, the MSOP Spiritual Practices Policy applied to everyone on the same basis, no matter their faith. Because Daywitt has failed to meet the threshold showing for an equal protection claim, the Court will overrule his objection and adopt the R&R's recommendation to dismiss Daywitt's equal protection claim without prejudice.

### C. Individual Capacity Claims

Daywitt's individual capacity claims fail for an additional reason: the Defendants are protected by qualified immunity.

While the R&R found that Daywitt failed to allege sufficient personal involvement, the Court does not agree. To assert liability against individual defendants, a plaintiff must allege a specific violation by specific defendants. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011); *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001). When construing the complaint liberally, Daywitt indicated which Defendants engaged in which practices he alleged to be in violation of his constitutional rights. For example, "Daywitt submitted a request to Defendant Clark requesting he be able to attend studies and activities via ITV, but was told via response cross-site religious services will not be allowed." (Compl. ¶ 34.)

Above, the Court found those allegations to be insufficient burdens on Daywitt's religious expression, but they are not insufficiently specific as to each Defendant's personal involvement. So, the Court will not dismiss the individual capacity claims on this basis.

However, qualified immunity serves as a basis to dismiss Daywitt's individual capacity claims. The qualified immunity analysis involves two questions: (1) whether the facts, as alleged by the plaintiff, establish a violation of a constitutional right, and (2) whether the constitutional right was clearly established at the time the defendant allegedly violated the right. *Pearson v. Callahan,* 555 U.S. 223, 232 (2009); *Burke v. Sullivan,* 677 F.3d 367, 371 (8th Cir. 2012). Either step of the qualified immunity inquiry may be addressed first. *Pearson,* 555 U.S. at 236.

Daywitt's claims fail on the first prong because he failed to allege any constitutional violations. Accordingly, the Defendants are afforded qualified immunity. But, because the underlying constitutional claims are dismissed without prejudice, it is premature for the Court to rule that qualified immunity requires dismissal with prejudice of Daywitt's individual capacity claims. The Court will thus modify the Magistrate Judge's recommendation and dismiss the individual capacity claims **without** prejudice. Should Daywitt amend his complaint, and Defendants believe qualified immunity applies, they remain free to raise that defense to any amended claims.

### D.    Official Capacity Claims

Daywitt does not dispute that his official capacity damages claims are barred under the Eleventh Amendment. (Pl.'s Opp'n Defs.' Mot. Dismiss at 21, May 10, 2024, Docket

No. 27.) Indeed, all damages actions against the state are barred by the Eleventh Amendment absent consent from the State or abrogation by Congress. *EEE Mins., LLC v. North Dakota*, 81 F.4th 809, 815–16 (8th Cir. 2023). Neither waiver nor abrogation apply here, so the Court will adopt the Magistrate Judge's recommendation and dismiss official capacity damages claims with prejudice.

## CONCLUSION

Daywitt alleges that since he was transferred from Moose Lake to St. Peter, MSOP has infringed on his rights to freely express his religion. However, Daywitt's allegations are not plausibly pled for various reasons. As such, the Court will dismiss most of Daywitt's claims without prejudice.[6] The Court, however, will dismiss Daywitt's substantive due process and official capacity damages claims with prejudice because those claims cannot be cured through amendment. The Court will thus overrule Daywitt's objections and adopt the Magistrate Judge's R&R with a slight modification to dismiss the individual capacity claims without prejudice. The Court will grant Defendants' motion to dismiss and dismiss Daywitt's complaint in its entirety.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

---

[6] Without prejudice means that Daywitt can fix any deficiencies in those claims and refile.

-16-

1. Plaintiff's Objection [Docket No. 33] to Report and Recommendation is **OVERRULED**.

2. The Report and Recommendation [Docket No. 32] is **ADOPTED as modified**:

    a. Daywitt's individual capacity claims are dismissed without prejudice;

    b. The Report and Recommendation is adopted in all other respects without modification.

3. Defendants' Motion to Dismiss [Docket No. 17] is **GRANTED**.

4. Plaintiff's Complaint [Docket No. 1] is **DISMISSED** as follows:

    a. Plaintiff's RLUIPA claims are **DISMISSED without prejudice**;

    b. Plaintiff's First Amendment claims are **DISMISSED without prejudice**;

    c. Plaintiff's free exercise claims under the Minnesota State Constitution are **DISMISSED without prejudice**;

    d. Plaintiff's substantive due process claims are **DISMISSED with prejudice**;

    e. Plaintiff's equal protection claims are **DISMISSED without prejudice**;

    f. All claims against individual capacity Defendants are **DISMISSED without prejudice**; and

    g. All claims for damages against official capacity Defendants are **DISMISSED with prejudice**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  March 25, 2025
at Minneapolis, Minnesota.

*John R. Tunheim*
JOHN R. TUNHEIM
United States District Judge